_____

No. 95-1092MN

_____

Frangena A. Shannon,          *
                              *
        Appellant,            *
                              *
                              * On Appeal from the United
    v.                        * States District Court
                              * for the District of
                              * Minnesota.
Ford Motor Co., a Delaware    *
Corporation,                  *
                              *
        Appellee.             *

_____

Submitted:  October 20, 1995

Filed:  January 3, 1996
_____

Before RICHARD S. ARNOLD, Chief Judge, WOLLMAN and MORRIS SHEPPARD
     ARNOLD, Circuit Judges.
_____

RICHARD S. ARNOLD, Chief Judge.


        Fragena A. Shannon, an African-American woman, claims Ford
Motor Company failed to promote her to supervisor because of her
race and sex.  She appeals the District Court's[1] order granting
summary judgment for Ford.  The District Court held that Ms.
Shannon had failed to establish a prima facie case of race
discrimination under 42 U.S.C. § 1981, and that she had not
exhausted her administrative remedies for her Title VII sex-
discrimination claim.  We affirm.

_____

        [1]The Hon. James M. Rosenbaum, United States District Judge for
the District of Minnesota.

I.


In early 1985, Ms. Shannon was an "assembler" at Ford's Twin Cities plant. Assemblers are "non-skilled" workers, paid by the hour. In March, Ms. Shannon learned that Ford was accepting applications for salaried, supervisor positions, and she applied for the job. Ms. Shannon successfully completed the required skill-assessment process, which Ford calls the "Manufacturing Supervisor Selection System" ("MSSS"), and Ford put her on the waiting list for a supervisor position. Also in 1985, Ms. Shannon applied for an apprenticeship in the skilled-trades program operated jointly by Ford and her union, the United Auto, Aerospace, and Agricultural Implement Workers of America ("UAW"). She once again passed the required tests, and was placed on another, entirely separate, waiting list for placement as an apprentice.

In the Fall of 1987, after ten months' absence from work due to a broken ankle, Ms. Shannon was offered a position as an apprentice electrician. She was told, however, that she could not stay on the supervisor waiting list if she accepted the apprenticeship; she had to pick one or the other. Ms. Shannon says she protested, asking why she had to give up her spot on the list. Still, she decided to accept the apprenticeship because "[she] didn't want to pass up the opportunity of going into the skilled trades . . .." Ford then took her name off the list, and Ms. Shannon never tried to get back in line for a supervisor position.

In August 1989, Ms. Shannon filed a complaint with the St. Paul Department of Human Rights, alleging race and sex discrimination. She claimed that "throughout my apprenticeship . . . I have been subjected to harassment and

differential treatment."[2]   The Department, however, found "no probable cause" for her allegations.[3]   Ms. Shannon lodged another complaint, also claiming race and sex discrimination, with the Equal Employment Opportunity Commission ("EEOC") in November, 1989. In February 1992, the EEOC gave Ms. Shannon the right to sue.

In her three-count complaint, Ms. Shannon charged Ford with sex discrimination in violation of Title VII, race discrimination under 42 U.S.C. § 1981, and "reprisal discrimination" under the Minnesota Human Rights Act, Minn. Stat. § 363.01 et seq., and Title VII.  All three counts rested on the same allegations:  Ms. Shannon claimed that (1) she was subjected to a sexually hostile and abusive environment in the skilled-trades program; (2) she was not given adequate training in the program; (3) male apprentices enjoyed preferential treatment in training, education, and work assignments; and, finally, (4) she was not promoted to supervisor. Ford moved for summary judgment.  In August 1994, the District Court granted Ford's motion on Ms. Shannon's failure-to-promote claims, but, after reviewing the litany of alleged insulting

---

[2]It is undisputed that Ms. Shannon was, at times, poorly treated by some of her co-workers and supervisors in the skilled-trades program.  For example, one journeyman showed Ms. Shannon a picture of a toilet and told her, "that's you down there with all the other [. . .]."  Another time, someone placed a sexually explicit "application for a date" at Ms. Shannon's work station. According to Ms. Shannon, when she reported the incident, her supervisor only laughed.  Several times, in fact, she complained to her supervisors and to her union representative that she was being harassed and demeaned, and not receiving adequate training.  One of her supervisors responded by telling her, "you are black and a woman, so you have two strikes against you.  They don't want you [in the program] anyway."

[3]The Department found that Ms. Shannon's "credibility has some weaknesses" and that Ford's "skepticism regarding [Ms. Shannon's] allegations that her poor work performance was caused by co-worker harassment and lack of training is supported by . . . [Ms. Shannon's] excessive absenteeism . . . [her] argumentative and emotional behavior . . . [her] difficulty accepting directions and her attitude that her assignments were menial . . .."

incidents during her apprenticeship, the Court denied the motion in all other respects.[4]

Ms. Shannon now appeals the District Court's decision, claiming that the Court erred by deciding that her failure-to-promote claim was not "reasonably related" to the sex-discrimination charges she filed with the EEOC, and by finding that she did not establish a prima facie case that Ford failed to promote her because of her race. We review the District Court's order granting summary judgment de novo.

II.

Using the ubiquitous three-step burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the District Court held that Ms. Shannon failed to establish a prima facie case of race discrimination. To raise a presumption of discrimination in failure-to-promote cases, a plaintiff must show that (1) she is a member of a protected group; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) similarly situated employees, not part of the protected group, were promoted instead. Patterson v. McLean Credit Union, 491 U.S. 164, 186-87 (1989); Marzec v. Marsh, 990 F.2d 393, 395-96 (8th Cir. 1993). If a plaintiff establishes her prima facie case, the burden of production shifts to the employer, who must rebut the presumption of discrimination with evidence "that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Texas Department of

_____

[4]Ms. Shannon's remaining claims were tried before a jury. In September 1994, the jury found for Ford on all these claims. Specifically, in special interrogatories, the jury found that (1) Ford did not subject Ms. Shannon to unlawful sexual harassment, (2) Ford did not discriminate against her because of her sex, (3) Ford did not retaliate against her, and (4) Ford did not discriminate against her because of her race. These issues are not before us on appeal.

-4-

<u>Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). Once the employer meets its burden, the plaintiff may win by pointing to evidence which, if believed, would expose the employer's reason as a mere pretext for intentional discrimination. <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 958 (8th Cir. 1995) (citing <u>St. Mary's Honor Center v. Hicks</u>, 113 S. Ct. 2742, 2747 (1993)). We agree with the District Court that because Ms. Shannon accepted her skilled-trades apprenticeship knowing full well that her name would come off the supervisor waiting list, she was not "rejected" for a supervisor position.[5]

We emphasize, however, that there is nothing magical about the <u>McDonnell Douglas</u> three-stage framework. The framework itself is simply a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." <u>Patterson</u>, 491 U.S. at 186 (quoting <u>Furnco Construction Corp. v. Waters</u>, 438 U.S. 567, 577 (1978)). Put differently, the framework is a helpful tool, but it is still just a tool. We should not confuse the means - <u>McDonnell Douglas</u>'s three-step process - with the end, which is deciding whether or not an employer illegally discriminated. See, <u>e.g.</u>, <u>Winbush v. Glenwood State Hospital</u>, 66 F.3d 1471, 1480 (8th Cir. 1995) (citing <u>United States Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 713-15 (1983)) ("central question" is not whether district court correctly found prima facie case, but whether there was sufficient evidence of intentional discrimination). After all, the <u>McDonnell Douglas</u> framework exists to provide discrimination plaintiffs a way to prove their case when they do <u>not</u> have "explicit, inculpatory evidence of discriminatory intent." <u>Hutson</u>

---

[5]Everyone agrees that supervisors are and may only be selected from among those employees on the supervisor eligibility list. <u>Lowe v. City of Monrovia</u>, 775 F.2d 998, 1007-10 (9th Cir. 1985), <u>amended</u>, 784 F.2d 1407 (9th Cir. 1986), on which Ms. Shannon relies, discussed a very different situation. In that case, the plaintiff had evidence that the employer only hired from "the list" when whites were next in line, not when blacks were at the top.

-5-

v. <u>McDonnell Douglas Corp.</u>, 63 F.3d 771, 776 (8th Cir. 1995). If a plaintiff <u>does</u> have such evidence, burden-shifting analysis is unnecessary.

The District Court stated that <u>even if</u> the removal of Ms. Shannon's name from the waiting list was somehow improper or discriminatory, the fact remains that she could not be considered and rejected for promotion once her name was off the list, and therefore could not establish her prima facie case. But if Ms. Shannon had produced any evidence that the removal of her name from the list was an act of intentional discrimination, aimed at preventing her promotion because she is black, then her failure to establish the usual prima facie case would not, by itself, doom her case. It would be ironic - bizarre, in fact - if a victim of discrimination were unable to vindicate her rights because she had the peculiar misfortune of being discriminated against in a way that necessarily prevented her from making her prima facie case. See <u>International Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 367 (1977) (noting District Court's finding that a "<u>per se</u> prohibition of relief to nonapplicants could . . . put beyond reach of equity the most invidious effects of employment discrimination"). For example, if black employees were told by their employer that they should not bother applying for supervisor positions, and so black employees never applied, they would, strictly speaking, be unable to establish all the elements of a prima facie case. See <u>Winbush</u>, 66 F.3d at 1481 (reason plaintiffs did not apply for promotions "was either that they did not know how or when to apply or that they were led to believe that applying would do no good").[6] But this inability would certainly not be

---

[6]See also <u>Chambers v. Wynne School Dist.</u>, 909 F.2d 1214, 1217 (8th Cir. 1990) (failure to apply formally will be excused if plaintiff makes every reasonable attempt to convey interest in job to employer); <u>Easley v. Empire Inc.</u>, 757 F.2d 923, 930 n.7 (8th Cir. 1985) ("Formal applications . . . will be excused when a known discriminatory policy . . . deters potential jobseekers."); <u>Paxton v. Union Nat'l Bank</u>, 688 F.2d 552, 568 (8th Cir. 1982) (because

fatal to their case if they had solid evidence that their employer's discouragement was discriminatory. Proof of actual discrimination - the real issue, after all - may excuse a plaintiff's failure to establish a prima facie case via the usual route. Id. at 1481 n.16 ("[D]iscriminatory practices can excuse plaintiffs from making a typical prima facie case of employment discrimination.").

Winbush illustrates our point. In that case, the District Court found overwhelming evidence that the defendants used "discretionary promotion policies [that] discouraged promotional opportunities for [the plaintiffs] and reflected systematic and purposeful discriminatory treatment of them based on their race." Id. at 1480. The court also found evidence of a "hostile racial working environment." Ibid. Despite this evidence, the defendants insisted that the plaintiffs had failed to prove that they applied for vacant positions, or that they were adequately certified by the Iowa Department of Personnel, or that they were denied a specific promotion. Id. at 1479. But given the evidence of discrimination and considering all the relevant facts of the particular case, we excused the plaintiffs' failure to establish all the usual elements of the prima facie case. Id. at 1481-82.

Again, we agree with the District Court that Ms. Shannon did not establish her prima facie case. She was not rejected; she was merely taken off the list. But if Ms. Shannon could show that her removal from the list was discrimination in the guise of a race-neutral policy, if, for example, Ford put the "either/or," "apprenticeship/supervisor list" choice to her, and not to

_____

vacancy was not posted, failure to apply did not defeat prima facie case), cert. denied, 460 U.S. 1083 (1983); Royal v. Missouri Highway & Transp. Comm., 655 F.2d 159, 163 n.5 (8th Cir. 1981) (applications generally not taken for foreman positions, so failure to apply not fatal to case).

similarly situated white employees, we would excuse her failure to make her prima facie case.  In this case, however, Ms. Shannon has produced no evidence that Ford's reason for not promoting her is a sham.  She does argue that she did not ask or want to have her name taken off the list.  This is irrelevant.  She accepted the apprenticeship knowing her name would be taken off; it doesn't matter that she would have preferred that it stay on.

Ms. Shannon also suggests that Ford's discriminatory intent is proved by the fact that there has never been a black female supervisor at the Twin Cities plant.  And she claims that Ford promoted 27 white workers to supervisor after she became a candidate in 1985, 15 of them after she returned to work in 1987.  All this, Ms. Shannon argues, shows Ford's discriminatory intent in "steering" her into the skilled-trades program.  These claims are completely unsupported.  The evidence Ms. Shannon cites for her assertion that 15 white people were promoted to supervisor since 1987 makes no reference to the race of these persons.  And even if 15 white people were promoted, Ms. Shannon must show that these people were similarly situated to her, yet treated differently, to prove intentional discrimination.  See Williams v. Ford Motor Co., 14 F.3d 1305, 1309 (8th Cir. 1994).  That is, she must show that they, unlike her, were permitted to enter the apprentice program while remaining on the supervisor waiting list.  Ms. Shannon asserts that "many white males participate in both programs," but she points to no evidence.  She claims that some people moved from supervisor positions into the apprentice program, but this claim does not help her case because these individuals are not similarly situated.  Finally, the alleged lack of black women supervisors does not support her race-discrimination claim, given that Ms. Shannon admits that several black men have been supervisors.

We conclude that, unlike the plaintiffs in Winbush, Ms. Shannon has presented no evidence of intentional discrimination which might excuse her failure to establish the four elements of

-8-

the Patterson prima facie case.  See Chambers, 909 F.2d at 1217-18 (refusing to waive McDonnell Douglas requirement that plaintiff "apply" because there was no evidence that employer discriminated or that plaintiff expressed any interest in the position).  She was not rejected; rather, she voluntarily choose a different path.  We have no evidence that her choice was tainted by any discrimination by Ford.  We therefore affirm the District Court's order granting summary judgment on Ms. Shannon's § 1981 failure-to-promote claim.

III.

The District Court held that Ms. Shannon's Title VII sex-discrimination claim was barred because she did not exhaust her administrative remedies.  The Court found that Ms. Shannon complained to the EEOC and the St. Paul Department of Human Rights about harassment and differential treatment in the apprenticeship program only, not in the promotion process.  Ms. Shannon's claim that Ford refused to promote her to supervisor because she is a woman is not, the District Court reasoned, "reasonably related to the substance of [Ms. Shannon's] prior administrative charges."

Ford suggests, albeit tepidly, that Ms. Shannon waived her right to appeal this holding because she never responded to Ford's "failure to exhaust" argument in the District Court.  Ford relies on the uncontroversial general rule that the courts of appeals "do not consider arguments raised for the first time on appeal."  See, e.g., Dorothy J. v. Little Rock School District, 7 F.3d 729, 734 (8th Cir. 1993).  This rule promotes the efficient management and orderly resolution of cases and reflects the respect properly due federal district judges.  On the other hand, "this is not a flat rule but rather a matter of prudence and discretion."  Struempler v. Bowen, 822 F.2d 40, 42 (8th Cir. 1987).  We have noted before that

"[w]hen an issue was actually decided in the

-9-

> trial court, even though not expressly raised
> by the parties, the rule against consideration
> of the question on appeal loses a good deal of
> its force.  It is not unfair to a trial court
> for an appellate court to decide a question
> that the trial court actually reached in its
> opinion . . .."

Ibid.  In this case, we do not think it would show any disrespect to the District Court, nor would it be unfair to Ford, to address Ms. Shannon's argument on the exhaustion issue.

Ms. Shannon did not exhaust her Title VII failure to promote claim.  In general, "[e]xhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts." Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994) (citing Patterson v. McLean Credit Union, 491 U.S. 164, 180-81 (1989)). To exhaust her remedies, a Title VII plaintiff must timely file her charges with the EEOC and receive, from the EEOC, a "right to sue" letter.  42 U.S.C. § 2000e-5(b), (c), (e).  The proper exhaustion of administrative remedies gives the plaintiff a green light to bring her employment-discrimination claim, along with allegations that are "like or reasonably related" to that claim, in federal court.

In Ms. Shannon's interview statement to the St. Paul Department of Human Rights,[7] she stated:

_____

[7]Ford notes that Ms. Shannon failed to bring her Title VII case within 90 days of the closure of the St. Paul investigation. 42 U.S.C. § 2000e-5(f)(1).  Ford concludes that Ms. Shannon therefore may not now rely on her St. Paul complaint.  Given our decision, though, it makes no difference whether she relies on the complaint or not.  The District Court decided that "neither the EEOC charge, nor that filed with the St. Paul Department of Human Rights, raises the issue of promotion to supervisor."  Given this

-10-

> While I had my broken ankle, there were openings in the skilled trades. I had taken the test and passed, but they were trying to avoid bringing me into the apprenticeship. . . . They were hiring people from outside. I had also done extremely well on the management test.

Ms. Shannon contends that her passing reference to the "management test" in effect incorporated her complaints about discrimination in the apprenticeship program into an admittedly inchoate failure-to-promote claim. We think Ms. Shannon was actually using her performance on the management test, and Ford's hiring of "outside" people, to support her argument that Ford was "trying to avoid bringing [her] into the apprenticeship." Also, Ms. Shannon's EEOC claim alleges that Ford discriminated against her "in the terms and conditions of the apprenticeship program, harassment, training and pay." We do not think that language, reasonably read, suggests an implicit failure-to-promote claim.

Ms. Shannon rightly reminds us that courts should not use Title VII's administrative procedures as a trap for unwary pro se civil-rights plaintiffs. We agree, and therefore, when appropriate, construe civil-rights and discrimination claims charitably. This liberal-construction rule "stems from the rather fundamental policy that mere vagueness in a pro se claim should not sound the death knell for the plaintiff's discrimination allegation." Pickney v. American Dist. Telegraph Co. of Ark., 568 F. Supp. 687, 690 (E.D. Ark. 1983). But there is a difference between liberally reading a claim which "lacks specificity," ibid., and inventing, ex nihilo, a claim which simply was not made.

This case is a lot like Williams, supra. In that case, the EEOC sent Ms. Williams a "right to sue" letter, authorizing a race-

_____

conclusion, with which we agree, we see no reason for refusing to discuss the St. Paul complaint.

-11-

discrimination suit, but she failed to sue within 90 days of receiving the letter. Three years later, she complained to the EEOC again. The second complaint stated "I have been denied a promotion and a merit raise . . . because I filed a previous charge of discrimination. I believe I am being retaliated against for filing the charge in violation of Title VII." Williams, 21 F.3d at 222. The plaintiff then sued pro se in federal court, alleging, inter alia, both race discrimination and retaliation. The District Court dismissed the race-discrimination claim because Ms. Williams had failed to exhaust her administrative remedies on that claim. Id. at 220-21. This Court held that the District Court was right, because the race-discrimination claim was "separate and distinct from her claims of retaliation." Id. at 223. We noted that Ms. Williams's EEOC complaint was not at all vague: she "specifically and unambiguously alleged that Water Works retaliated against her because she had filed a charge with the EEOC in January 1987." Ibid.

In Williams the plaintiff mentioned her unexhausted discrimination claim in her retaliation complaint. Ms. Williams claimed that she was retaliated against because she had complained about racial discrimination three years before. But this reference to her previous complaint was not enough to exhaust, for Title VII purposes, the discrimination claim. In this case, Ms. Shannon's complaint with the St. Paul Department of Human Rights mentioned a "management test," but this reference is an insufficient hook for her failure-to-promote claim. Her alleged and actual mistreatment by her colleagues and supervisors in the apprenticeship program, which is run jointly by Ford and the UAW, does not translate into or even relate to Ford's alleged failure to promote her through the MSSS. The apprenticeship and supervisor programs are completely separate, run by different people using different standards. Perhaps the bias which allegedly infects Ford's apprenticeship program also infects the MSSS, but we think the "reasonably related" standard requires more than this. We agree with the

-12-

District Court that Ms. Shannon failed to exhaust her sex-discrimination claim.

IV.

For the reasons discussed above, we affirm the District Court's order granting summary judgment for Ford.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.