# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1472

_____

| | | |
|---|---|---|
| Howard Lockridge, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Board of Trustees, of the University | * | |
| of Arkansas, A Public Body Corporate; | * | |
| Dr. B. Allan Sugg, in his official | * | |
| capacity as President of the University | * | |
| of Arkansas; Dr. Steven Jones, | * | |
| Chancellor, Phillips Community | * | |
| College of the University of Arkansas, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted:  March 13, 2002

Filed: June 24, 2002

_____

Before MORRIS SHEPPARD ARNOLD, HEANEY and RILEY, Circuit Judges.

_____

HEANEY, Circuit Judge.

The Board of Trustees for the University of Arkansas, President B. Alan Sugg (Sugg), and Chancellor Steven Jones (Jones) appeal the district court's[1] rejection of their motion for summary judgment in this failure to promote case. The appellants allege that Howard Lockridge, the Technical and Industrial Department Chair of Phillips Community College of the University of Arkansas (PCCUA), failed to establish a prima facie case of race discrimination because he did not apply for the vacant position in question. They also appeal the district court's decision not to dismiss the individual liability claim against Jones, nor apply qualified immunity to him. We affirm.

I.      Background

In the spring of 1998, Jones indicated that he was going to fill the position of Dean of Industrial Technology and Workforce Development on the Stuttgart campus.[2] The parties dispute whether this position was newly created or a vacant "old" position. On April 21, 1998, the announcement for the dean's position was distributed to the entire PCCUA community through electronic mail. It was also advertised in the Arkansas Democratic Gazette for three days, beginning on April 23, 1998, and in the Stuttgart Daily Leader on April 22 and April 28, 1998. Lockridge did not apply for the position.[3] Three people did apply, and in May 1998, the search committee recommended that Tracy McGraw, a white male, be hired. Jones accepted the search committee's recommendation.

---

[1]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

[2]The record is unclear as to whether a search committee was utilized to fill the vacant position.

[3]Dean Linda Killion, his supervisor at the time, asked whether he was going to apply for the dean's position, and, angrily, he said no.

-2-

On June 29, 1998, Lockridge filed a Charge of Discrimination with the EEOC against PCCUA, alleging he had been the subject of racial and gender discrimination. He complained that he was denied the opportunity to apply for the position of Dean of Industry and Technology, and that McGraw was less qualified than he.

In March, 1999, following an investigation, the EEOC informed Lockridge that the evidence did not substantiate his allegations. He had not applied for the position, he was on notice of the announced position, and he told his supervisor that he was not going to apply for the position. Further, the EEOC found that the campus had hired a black male as dean in 1988, who was then promoted to Vice Chancellor, a position he retains today.

Lockridge filed his complaint in federal court on May 1999, pursuant to 42 U.S.C. §§ 1981, 1983, and 2000e (Title VII), alleging employment discrimination on the basis of race and gender. Defendants filed a motion for summary judgment, asserting that Lockridge failed to establish a prima facie case of race and gender discrimination because: (1) the person hired for the dean's position is the same gender as Lockridge; and (2) Lockridge had not applied for the dean's position after it had been posted and after his supervisor asked whether he was going to submit an application. His failure to apply, PCCUA contends, is fatal to his disparate treatment claim.

The district court denied appellants' summary judgment motion on Lockridge's claim of race discrimination because it found that Lockridge:

> has presented sufficient questions of fact in the deposition excerpts regarding the policy and practices followed at PCC as to promotions in whether certain positions such as Killion's selection to department chair were announced as vacancies, whether everyone was required to make application for a promotion, and the usual time frame between when vacancies were announced and

the period for submitting applications ended . . . . [T]he Court cannot say at this time that plaintiff's failure to submit an application is fatal to his [race discrimination] claim.

Howard Lockridge v. Board of Trustees of the University of Arkansas, et al., No. 2:99CV00092, slip op. at 6 (E.D. Ark. Jan. 30, 2001) (citing Lyoch v. Anheuser-Busch Companies, 139 F.3d 612 (8th Cir. 1998)). The court also determined that Jones and Sugg were not immune under the Eleventh Amendment in their official capacities for the claim of prospective relief, and that Jones was not entitled to immunity in his individual capacity because Lockridge had alleged Jones's intent to discriminate against him, and the promotion policy at PCCUA, largely supervised by Jones, remained ambiguous.

PCCUA appeals, arguing that Lockridge failed to establish a prima facie case of race discrimination under McDonnell Douglas, and that Jones, in his individual capacity, should be dismissed from the lawsuit.

II    Discussion

A.  Failure to Promote Claim

Summary judgment is appropriate if there are no genuine issues of material fact as to the essential elements of a party's case. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "The elements of a prima facie case for a failure-to-promote claim are well established: The plaintiff must demonstrate '(1) that she is a member of a protected group; (2) that she was qualified and applied for a promotion to a position for which the employer was seeking applicants; (3) that despite her qualifications, she was rejected; and (4) that other employees of similar qualifications who were not members of a protected group were promoted at the time plaintiff's request for promotion was denied.'" Lyoch,139 F.3d at 614 (quoting Marzec v. Marsh, 990 F.2d 393, 395-96 (8th Cir.1993)).

In an individual disparate treatment case, once the plaintiff has established a prima facie case of race discrimination, it must be determined whether the employer's actions were motivated by discriminatory intent. This may be shown through direct or circumstantial evidence. If the plaintiff relies on circumstantial evidence, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), guides the analysis. Under the McDonnell Douglas framework, after a plaintiff makes a prima facie showing of liability, the employer must produce evidence that it had a legitimate, nondiscriminatory reason for its actions. Id. If the employer meets this burden of production, then the burden shifts to the plaintiff to show that the employer's actions were a pretext for discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citing McDonnell Douglas, 411 U.S. at 804). We first consider whether Lockridge has established a prima facie case of race discrimination.

There is no question that Lockridge, an African American, is a member of a protected group. It is also evident that he was not promoted to the vacant deanship, thus satisfying the third factor in the analysis. The position was filled by a white man, which fulfills the fourth factor. We therefore focus our attention on the second factor in the analysis: whether Lockridge was required to have made formal application for the position to successfully present a prima facie case of race discrimination.

An employee's failure to apply for a position pursuant to established procedures will normally bar his claim. However, the failure to apply is frequently excused where the employer has no formal application process or where the employee is unaware of the opportunity. See Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1105 n.13 (8th Cir. 1996) ("the application requirement should be excused because Anheuser had a reason or duty to consider Kehoe for the job.")(citing Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996) ("It would be ironic . . . if a victim of discrimination were unable to vindicate her rights because she had the peculiar misfortune of being

discriminated against in a way that necessarily prevented her from making her prima facie case."")); Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984) ("defendant used no formal procedures for posting notice of available promotions or for determining who would be offered the promotion. Instead, the company relied on 'word of mouth' and informal review procedures"); EEOC v. Metal Service Co., 892 F.2d 341, 348 (3rd Cir. 1990) ("Courts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer.").

Courts also waive the application requirement where an application would have been futile because of the employer's discriminatory practices, or where the employer exhibits a "pattern or practice of discrimination," but this waiver appears to apply only in class action cases. See Craik v. Minnesota State Univ. Bd., 731 F.2d 465, 469 (8th Cir. 1984) ("[h]ow the prima facie case is established and the consequences of its establishment . . . depend on whether the case is (1) brought by a single plaintiff on his or her own account or (2) a class action alleging a pattern or practice of discrimination."); Lowery v. Circuit City Stores, 158 F.3d 742, 761 (4th Cir. 1998) (vacated on other grounds, 199 S.Ct. 2388 (1999)) ("because the Supreme Court has never applied the Teamsters method of proof in a private, non-class action for employment discrimination, and because the nature of the proof in remedies in class and government pattern or practice actions differs vis-a-vis private, non-class actions, we decline to give individual plaintiffs a pattern or practice cause of action or allow them to use the Teamsters method proof.").

Another circumstance in which courts need not consider the application requirement, however, is where the employer has failed to establish a clear personnel procedure for promotions. This is direct evidence of discrimination, and the McDonnell Douglas analysis is therefore inapplicable. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985). In Watson v. National Linen Service, 686 F.2d

877, 881 (11th Cir. 1982), where an individual plaintiff alleged discriminatory failure to promote, the court explained,

> Our review of the record reveals that considerable confusion surrounds personnel procedures at National's Tampa Facility. As illustrated by this case, National's policies, which it apparently neither followed nor communicated to its employees, changed from day to day. The district court did not make findings in this area. The failure to establish "fixed or reasonably objective standards and procedures for hiring" is a discriminatory practice.

(quoting Brown v. Gaston Co. Dyeing Machine Co., 457 F.2d 1377, 1382 (4th Cir. 1972); United States v. Bethlehem Steel Corp., 446 F.2d 652, 655 (2d Cir. 1972)). In Brown, a class action case, the court found that Gaston's employment policies suffered a lack of "fixed or reasonably objective standards and procedures for hiring" because it did not have objective guidelines for hiring, for pay increases within job classifications, and for promotion or transfer from one job to another. 457 F.2d at 1382.

In the case before us, the record shows that PCCUA utilized several procedures for hiring and promotions. It is unclear under what circumstances Jones elected to use each procedure. Lockridge's attempts at promotion at PCCUA demonstrate the seemingly random and subjective promotions process. For example, in 1988, Lockridge "formally applied" for the position of Director of Continuing Education. Jones responded to this application by telling Lockridge he would contact him when PCCUA decided to fill the position. In 1992, PCCUA hired Deborah King, a white woman, as Director of Continuing Education. Lockridge alleges that the position was never officially advertised or posted.

In 1988, the college hired Jack McCommon, a white man, as Associate Dean of Technical and Industrial Programs. Lockridge alleges this position was not posted,

and that the person hired was not as qualified as he. At the time, Lockridge had two technical graduate degrees and twelve years of teaching experience. In 1993, Lockridge applied for the position again and allegedly was not interviewed for the job because he lacked the "requisite vision." Although Steven Murray, Academic Dean of Instruction at the time, stated that the college's hiring policy was to conduct an internal search for qualified applicants before advertising outside the college, the record does not show whether an internal search was conducted. Ultimately, John Little, a white male, was recommended for the position, and Jones approved this recommendation.

In 1995, Jones decided to merge the Division of Technical and Industrial Education, where Little was Associate Dean, and the Division of Business and Data Processing, where Linda Killion was Associate Dean, to form the Division of Business and Technology. After having fired Little, Jones eliminated that deanship, and Killion became the Dean of Business and Technology. The record shows that Killion did not file an application for this position or at least two others that she held at the college: department chair, and Associate Dean of Business & Data Processing.

Three years later, in 1998, Jones restored the "original dual components" of the divisions described above. Linda Killion was to lead the Division of Business & Computer Technology, and the college was to commence a search for a person to lead the Division of Industrial Technology and Workforce Development. On April 21, 1998, Jones sent an e-mail to the faculty announcing his decision. On April 22, Lockridge asked Killion why she did not recommend him for the open position when she knew he was qualified for the job, and when the college policy was to look for qualified internal applicants first before conducting an external search. The record does not indicate how she responded to his pointed question. On May 5, 1998, Lockridge discovered that Tracy McGraw, a white man, had been hired for the deanship based on the search committee's recommendation.

Appellants insist that the hiring process in this instance could not have been more explicit: there was a vacant position at the college; the administration posted the position announcement on campus; advertised it in state and local newspapers, and e-mailed the announcement to the entire campus community; and Lockridge's supervisor asked Lockridge whether he was going to apply for the position. It was not, they assert, a "vague and secretive" process. Nevertheless, the college fails to show what its hiring and promotion procedures actually are. The record indicates that Chancellor Jones has the discretion to determine whether a search committee or the appointment process for a vacant position will be utilized.[4] He also has the ultimate authority in

---

[4] In deposition, Jones provided the following responses to questions regarding the promotions policy at PCCUA:

Q. [have you given notice] to the faculty of how vacancies for promotions will be determined? Are there any writings?

A. There's a college policy that discusses the general protocols for filling new positions . . . we have to adhere to state regulations on advertisings [sic] and postings and those sorts of issues.

* * *

Q. Now if you choose to, decide to promote someone you have that power don't you?

A. If a recommendation is made to me for a promotion consideration, I ultimately do make the hiring decision, yes.

Q. And sometimes you make the judgment of whether or not you're going to promote somebody or create or restructure a section of the department in order to determine some other way for filling a vacancy?

A. Yes, sir; that is my responsibility as CEO.

Deposition of Dr. Steven W. Jones at 7-8.

-9-

hiring decisions. We conclude that Lockridge has presented sufficient questions of fact regarding the manner in which Jones hired and promoted faculty members. The evidence in the record fails to clarify which positions were announced as vacancies at the college, whether everyone was required to make application for promotions, and what the usual time frame was between the announcement of a vacancy and the

Q. So that it is fair to say, isn't it doctor, that you had a policy of promoting from within?

A. No sir; it's not.

Q. Well, at least you had a policy of promoting people to the position of dean from within did you not?

A. That might be a fair assessment.

Id. at 22.

Q. Who was in line had you followed a promotion from within policy? Who was in line to get that other associate dean position based on your staff at that time?

A. Mr. Walker, I don't have a promotion from within policy.

Q. To associate dean you said you did.

A. I don't have a policy; no, sir.

Q. The practice then. According to your practice who would have been next in line to get that position?

A. Promotions from within have been a practice on occasions, on other occasions they have not been Mr. Walker.

Id. at 117.

deadline for the submission of an application. A reasonable jury could conclude that the subjective manner in which the administration conducted these matters is direct evidence of discriminatory practices, triggering an entirely different analysis than what appellants have presented to this court. We therefore affirm the district court's judgment allowing Lockridge's failure to promote claim on the basis of race to proceed to trial.

B.      Qualified Immunity

Jones appeals the district court's determination that he is not immune to suit in his individual capacity in this matter. The court held that Jones's alleged intent to discriminate against Lockridge on the basis of his race, if proved, would not be an act in good faith as required by Arkansas's indemnification law. The court also determined that the ambiguity surrounding the policy and practice regarding promotions at the college precluded Jones's qualified immunity defense. Accordingly, it denied Jones's request for summary judgment on the issue. A district court's denial of summary judgment based on qualified immunity is immediately appealable, Saucier v. Katz, 533 U.S. 194, 200 (2001); Sexton v. Martin, 210 F.3d 905, 909 (8th Cir. 2000) (citation omitted), and is reviewed de novo. Id.

Section 1983 provides individuals with a civil remedy for the violation of constitutional rights. To establish a § 1983 violation, the plaintiff must show 1) that a person has deprived him of a federal constitutional or statutory right; and 2) that the person acted under color of state law when it deprived the plaintiff of the federal right. Gomez v. Toledo, 446 U.S. 635, 640 (1980) (citation omitted). Lockridge must show, therefore, that Jones, acting under color of state law, deprived him of a constitutional right. The appellants allege that the complaint is devoid of any allegations of personal acts by Jones that deprived Lockridge of a constitutionally protected right. Jones conceded in his deposition, however, that he has the discretion to determine how a vacant position will be filled, either through a hiring process or by direct appointment.

-11-

Because PCCUA's ambiguous promotion policy may be direct evidence of race discrimination, it is possible that Jones's alleged discretion in such matters is implicated. A reasonable jury could conclude that Jones was personally involved in failing to promote Lockridge because of his race in violation of the Fourteenth Amendment.

The determination of whether a state actor is entitled to protection of qualified immunity is a two-step process. Saucier, 533 U.S. at 200. The initial question is whether, taken in the light most favorable to Lockridge, the facts alleged show that Jones's conduct violated a constitutional right. Washington v. Normandy Fire Protection District, 272 F.3d 522, 526 (8th Cir. 2001) (citing Saucier, 533 U.S. at 201). There is no dispute that Lockridge has alleged that Jones violated §§ 1981 and 1983 by failing to promote him to the vacant deanship because of his race.

The next inquiry is whether the right was clearly established. Washington, 272 F.3d at 526 (citation omitted). "To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). This court has broadly considered what constitutes "clearly established law" for the purposes of a qualified immunity inquiry. Sexton, 210 F.3d at 909 (citing Boswell v. Sherburne County, 849 F.2d 1117, 1121 (8th Cir. 1988)).

If Jones, as a public official, intentionally discriminated against Lockridge on the basis of his race, he violated clearly established law set forth in 42 U.S.C. §§ 1981 and 1983, Title VII, and the Fourteenth Amendment. Therefore, we affirm the district court's determination that Jones is not immune to suit in his individual capacity in this matter.

III.    Conclusion

For the reasons cited above, we affirm the district court's decision to deny appellants' motion for summary judgment and request for qualified immunity.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

Despite the fact that Mr. Lockridge knew of the vacancy at issue here, knew the procedures for applying to fill that vacancy, told his supervisor that he was not going to apply, and in fact did not apply, the court nevertheless holds that he has made out a *prima facie* case of racial discrimination because not all positions at PCCUA were filled in the same way. With all due respect, this holding means that universities, and most other employers as well, may only infrequently be entitled to summary judgment in employment discrimination cases. That is because vacancies in many positions at universities (and most other places) are necessarily filled in different ways, depending on the nature of a position and its responsibilities, internal circumstances, and the exigencies of the moment, and someone has to decide what procedure to employ in any particular circumstance.

In reaching its result, the court resorts to a theory that Mr. Lockridge not only did not argue but specifically eschewed in his brief, namely, that Mr. Lockridge had produced direct evidence of discrimination. Mr. Lockridge (quite rightly, I think) openly admitted in his brief that he had no direct evidence of discrimination, and relied instead on the usual *McDonnell Douglas* burden-shifting framework to carry the day, because, he said, "direct evidence of unlawful discrimination by employers is rare."

The court's sole legal authority for its holding, moreover, is a twenty-year-old case from another circuit that presented circumstances entirely distinguishable from the present ones. In that case, the plaintiff did in fact apply for the position in issue

-13-

and the evidence was that employment procedures for filling comparable positions "changed from day to day." *See Watson v. National Linen Service*, 686 F.2d 877, 881 (11th Cir. 1982) (*per curiam*). There is no such evidentiary showing here, and, even if there were, I could not subscribe to the theory that such evidence would constitute direct evidence of discrimination. In fact, the court in *Watson* did not even intimate that it did. In addition, the number of competing inferences that the circumstances to which the court points will support is large, and the inference that racial animus lies behind the alleged variation in hiring practices is the weakest of all of them. Indeed, I suggest that a fact-finder would have to engage in speculation to discern a racial animus at work in the selection process involved in this case.

In any event, any evidence of racial discrimination in this case is entirely circumstantial. Direct evidence is evidence of conduct or statements by persons involved in making the relevant decision directly manifesting a discriminatory attitude. In past cases, for instance, direct evidence has consisted of employers' or supervisors' statements that "women ... were the worst thing" that had ever happened to the company, that the employer needed young employees, that the plaintiff was a "nigger" and "black boy," that the employee was "a woman in a man's job," and that the plaintiff needed a good Christian boyfriend to teach her to be submissive. *See*, respectively, *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1318 (8th Cir. 1994); *Kneibert v. Thomson Newspapers, Mich., Inc.*, 129 F.3d 444, 452 (8th Cir. 1997); *Ross v. Douglas County, Neb.*, 234 F.3d 391, 393 (8th Cir. 2000); *Simmons v. New Public Sch. Dist. No. Eight*, 251 F.3d 1210, 1213 (8th Cir. 2001); and *Campos v. City of Blue Springs*, No. 01-2814, 2002 WL 985573 at *1 (8th Cir. May 15, 2002). These statements are unmistakably probative of an improper animus at work. But there is nothing in this record that even remotely approaches these overtly insulting and revealing remarks.

Cases in which we have found that there was insufficient direct evidence of discrimination serve equally to make my point. We have held, for instance, that there

was insufficient direct evidence of animus when an executive said that the person chosen for the relevant position was "the right age." *See E.W. Blanch Co. v. Enan,* 124 F.3d 965, 970 (8th Cir. 1997). In the present case there are no discriminatory remarks whatsoever attributed to any of the defendants or their agents, or, indeed, to anyone else, not even statements that our cases commonly call "stray remarks." *See Clearwater v. Independent Sch. Dist. No. 166,* 231 F.3d 1122, 1126 (8th Cir. 2001).

I therefore respectfully dissent and would reverse the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.