Kelli Rae WENSEL, Plaintiff,

v.

STATE FARM MUTUAL AUTOMO-
BILE INSURANCE COMPA-
NY, Defendant.

No. C01–3019–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Aug. 7, 2002.

Michael Carroll, Coppola, Sandre, McConville & Carroll, PC, West Des Moines, IA, for Plaintiff.

Scott Davies, Jason Hedican, Briggs Morgan, PA, Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

TABLE OF CONTENTS

I. *INTRODUCTION* ..................................................... 1050
 A. *Procedural Background* ........................................ 1050
 B. *Disputed And Undisputed Facts* .............................. 1050
 1. *The training program* ................................... 1051
 2. *Wensel's employment and training* ...................... 1051

II. *DISCUSSION* ...................................................... 1052
 A. *Standards For Summary Judgment* ............................ 1052
 1. *Requirements of Rule 56* ................................ 1053
 2. *The parties' burdens* ................................... 1053
 3. *Summary judgment in employment discrimination cases* ... 1054
 B. *Common–Law Claims* ......................................... 1055
 C. *Discrimination Claims* ....................................... 1055
 1. Price Waterhouse *direct evidence framework* ............. 1057
 a. *The speaker* ....................................... 1059
 b. *The content* ....................................... 1059
 c. *Causation* ......................................... 1061
 2. *Circumstantial evidence and the* McDonnell Douglas
 *burden-shifting paradigm* ................................ 1062
 a. *Disparate treatment through constructive discharge* . 1062
 i. *Intolerableness of working conditions* ......... 1064
 ii. *Opportunity to respond* ........................ 1066
 b. *Pregnancy discrimination: Failure to receive independent agent contract* ....................................... 1068

 i. *Did Wensel suffer an adverse employment action?* ........... 1069
 ii. *Were other agents who received contracts similarly*
 *situated to Wensel?* ..................................... 1070
 iii. *Legitimate business justification and proof of pretext* ....... 1071

III. *CONCLUSION* ............................................. 1073

In this employment discrimination case, the plaintiff claims that, because of her pregnancy, she was treated unfairly and differently than her counterparts in the defendant's training program and, as a result, that she was constructively discharged. More specifically, the plaintiff participated in the defendant's Trainee Agent program with the hope of being awarded an independent agency contract and operating her own franchise insurance office in Sheldon, Iowa. However, after two extensions of her training period, the second of which occurred during the third trimester of her pregnancy, the plaintiff concluded that she would not be granted agency status and, consequently, resigned. On this motion for summary judgment, the court is called upon to decide whether the plaintiff has generated genuine issues of material fact on her claims of disparate treatment based on constructive discharge and failure to receive an independent agency contract.

## I. INTRODUCTION

### A. Procedural Background

The plaintiff filed this lawsuit on March 2, 2001. In her complaint, she alleges eight causes of action, including two statutory claims of gender discrimination under both Title VII and chapter 216 of the Iowa Civil Rights Act ("ICRA") and six state common-law claims of fraudulent concealment, fraudulent misrepresentation, fraud in the inducement, negligent misrepresentation, breach of contract, and promissory estoppel. This court's exercise of jurisdiction over the plaintiff's federal claim is proper pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. § 2000e–5(f)(3) (providing for original jurisdiction of Title VII claims in federal district courts). Jurisdiction over the plaintiff's state-law claims is proper pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction). In addition, this litigation is timely, because the plaintiff brought this suit within the prescribed 90 days after having received administrative releases from the Equal Employment Opportunity Commission and the Iowa Civil Rights Commission, which were issued on December 19, 2000 and on January 3, 2001, respectively.

This action is scheduled for a jury trial to begin on September 23, 2002. Before the court is the defendant's motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56. The court heard oral arguments on this motion on August 2, 2002. Counsel were thoroughly prepared, well-versed in relevant caselaw, and provided helpful input. The defendant was represented at these arguments by Scott Davies and Jason Hedican, of Briggs Morgan PA, Minneapolis, Minnesota. The plaintiff was represented by Michael Carroll, of Coppola, Sandre, McConville & Carroll, P.C., West Des Moines, Iowa.

### B. Disputed And Undisputed Facts

The factual background of this case can be summarized in a fairly succinct manner because there are very few disputed facts. Instead, the parties' principle arguments on this motion for summary judgment center on the legal significance of the circumstances surrounding the plaintiff's employment and her resignation.

### 1. The training program

The defendant, State Farm Mutual Automobile Insurance Company ("State Farm"), provides insurance services through sales agents who operate as independent contractors. "Agency 2000" refers to the former training program through which State Farm employees transitioned into independent agents. Prior to entering this training program, the plaintiff, Kelli Rae Wensel ("Wensel"), worked as a claims specialist for approximately three years. In April of 1997, after some preliminary screening, State Farm selected Wensel to participate in the Agency 2000 process. State Farm ceased the Agency 2000 program midway through Wensel's training process in December of 1998 and implemented a three-phase process, which is similar to Agency 2000 but stresses different criteria. Wensel notes, however, that State Farm did not inform candidates of the new program nor of its new criteria until March of 1999.

State Farm's Agency 2000 training program consisted of an initial six-month training period, after which a selection committee identified those candidates who would continue with the process. If a candidate was approved, she left her current position with State Farm and began intern training, which entailed a six to eight month intensive course of study at State Farm's regional headquarters. In Wensel's case, she completed her intern training in Lincoln, Nebraska. If a candidate successfully completed intern training, as Wensel did, she was offered a trainee agent contract.

In both the Agency 2000 and three-phase programs, while a trainee agent, or "TA," the candidate receives a salary from State Farm, and State Farm rents an office and pays most office expenses. During this time, TAs are supervised and evaluated by a "management team." Wensel's management team consisted of Terry Barton (Agency Vice President for Iowa), Mark Hecox (Agency Field Executive), Marsha Carlson (Agency Field Consultant), and Becky Moore and Mark Maxon (Agency Field Specialists). Throughout the training process, members of the management team provide feedback in the form of written progress reports. A candidate continues as a TA for a minimum of twelve months before being considered for an independent contractor agreement.

The three-phase program is similar to the Agency 2000 program except that it is broken down into separate phases, with greater emphasis on staff management. A TA advances through the phases of this program based on his or her management team's assessment of the TA's skills. At the time of her resignation, Wensel was in the final phase of the three-phase training process.

### 2. Wensel's employment and training

Wensel acknowledges that State Farm held the trainee agent process out as lasting a minimum of twelve months. However, she contends that the pattern and practice of the company was to award independent contracts to TAs after twelve months. Wensel became a TA in Sheldon, Iowa on August 1, 1998. At a meeting in May of 1999, State Farm informed Wensel that she would not receive her agency contract in August as Wensel had originally anticipated. At the time she learned of State Farm's decision, she was pregnant, but it is undisputed that State Farm did not know of her pregnancy at the time it decided to extend her training period. Upset because she had planned her pregnancy around her expectation to be an independent contractor in August, she left this meeting crying. It was at this time that her management team learned of her pregnancy.

Wensel resigned from the training program on January 10, 2000, effective February 29, 2000, after her training period was extended for a second time in October of 1999. Thus, Wensel had been a TA for 14 months at the time her training period was extended for the second time and for 17 months at the time of her resignation. She claims that when her training period was extended in October of 1999, it was clear to her that she would not be awarded independent contractor status and was constructively discharged.

Wensel completed her intern training with five other candidates: Jay Gotta, Brenda Henning, Eric Kent, Jeff Huff, and Rick Hernandez. Like Wensel, all five classmates became TAs. Of these, Kent, Huff, and Hernandez, like Wensel, were assigned to locations in Iowa, while Gotta was assigned in North Dakota and Henning was assigned in Nebraska. Huff received his agency contract after 15 months in the program, Kent was asked to leave the program after 24 months, and Hernandez resigned. Gotta received his agency contract after 15 months, and Henning received her contract after 12 months.

State Farm agency vice presidents are responsible for agency activities within specified territories, and, as Agency Vice President for Iowa, Terry Barton's territory solely covered the state of Iowa. Thus, because of State Farm's organizational structure, Gotta and Henning did not report to Barton, and, as a result, they were not necessarily subject to the same criteria during their training periods. Further, the decision of whether or not to award Wensel an independent agency contract was either exclusively Barton's call or was a decision that involved input from each of the management team members.

Wensel claims that Hecox, the agency field executive on her management team, told her when she began the training program to wait at least five years before starting a family. Not heeding his "counsel," Wensel became pregnant in the spring of 1999. When State Farm extended Wensel's training period for the second time in October of 1999, she was in the third trimester of her pregnancy, and, because of her imminent maternity leave, the extension would have prolonged her training period at least five more months, according to Wensel. As a result of this *soi-disant* indefinite extension, Wensel concluded that she would never obtain an independent contract with State Farm and resigned: "Having been twice denied the opportunity she had earned, and in order to avoid further financial impact, Wensel heard the message: we don't want pregnant agents, pregnancy and childbirth are a roadblock to your success." [Pltf.'s Br., at 61].

## II. DISCUSSION

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. #1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Cmty. Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997).

The essentials of these standards for present purposes are as follows.

### 1. Requirements of Rule 56

Rule 56 itself provides, in pertinent part:

Rule 56. Summary Judgment

. . . .

(b) For Defending Party. A party against whom a claim . . . is asserted . . . may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. . . . *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed. R. Civ. P. 56(a)-(c) (emphasis added).

Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538(1986)). As to whether a factual dispute is "material," the Supreme Court has explained that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir. 1999); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394.

### 2. The parties' burdens

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *e.g., Rose–Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County*, 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Instead, the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995). If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that

can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same).

### 3. Summary judgment in employment discrimination cases

■ Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Crawford*); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 615 (8th Cir. 1997) (quoting *Crawford*); *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford*); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir. 1997) (quoting *Crawford*); *Hardin v. Hussmann Corp.,* 45 F.3d 262, 264 (8th Cir.1995) ("[S]ummary judgments should only be used sparingly in employment discrimination cases.") (citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir.1990); and *Hillebrand,* 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson,* 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir. 1995) (quoting *Johnson,* 931 F.2d at 1244); *Crawford,* 37 F.3d at 1341 (quoting *Johnson,* 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often

depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341; *accord Snow,* 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant.") (citing *Crawford,* 37 F.3d at 1341); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford,* 37 F.3d at 1341); *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995) (quoting *Crawford,* 37 F.3d at 1341); *Johnson,* 931 F.2d at 1244.

Nevertheless, the Eighth Circuit Court of Appeals also observed that "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994), the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995) (citing *Reich v. Hoy Shoe Co.,* 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1134 (8th Cir.) (observing that the burden-shifting framework of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied,* 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). More recently, in *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that " '[t]he ultimate burden of persuading the trier of fact that the defendant . intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207

(1981)).[1] Thus, what the plaintiff's evidence must show, to avoid summary judgment or judgment as a matter of law, is "'1, that the stated reasons were not the real reasons for [the plaintiff's] discharge; and 2, that age [or race, or sex, or other prohibited] discrimination was the real reason for [the plaintiff's] discharge." *Id.* at 153, 120 S.Ct. 2097 (quoting the district court's jury instructions as properly stating the law). The Supreme Court clarified in *Reeves* that, to meet this burden, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097. The court will apply these standards to State Farm's motion for summary judgment, addressing each of the disputed issues in turn.

### B. Common–Law Claims

State Farm moved for summary judgment on each of Wensel's claims. In her response to State Farm's motion, she explicitly stipulated to the dismissal of her common-law claims, or more specifically, Items C–H of her complaint. Finding there exist no genuine issues of material fact regarding these claims, the court grants State Farm's motion for summary judgment on Wensel's claims for fraudulent concealment, fraudulent misrepresentation, fraud in the inducement, negligent misrepresentation, breach of contract, and promissory estoppel.

### C. Discrimination Claims

█ Wensel's complaint encompasses two disparate treatment claims—one based on constructive discharge and one based on her failure to receive an independent agency contract. In this lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and chapter 216 of the Iowa Civil Rights Act ("ICRA"), Iowa Code Ch. 216, she seeks to vindicate her civil rights. As a preliminary matter, it should be noted that in considering Wensel's discrimination claims, the court will generally make no distinction between claims based on federal law and comparable claims based on state law. This is appropriate because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA, Iowa Code Ch. 216. *See Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act."); *cf. Fuller v. Iowa Dep't of Human Servs.,* 576 N.W.2d 324, 329 (Iowa 1998) (recognizing that Chapter 216's prohibition on disability discrimination is the state-law "counterpart" to the ADA, and that, "[i]n considering a disability discrimination claim brought under Iowa Code chapter 216, we look to the ADA and cases interpreting its language. We also consider the underlying federal regulations established by the Equal Employment Opportunity Commission (hereinafter 'EEOC'), the agency responsible for enforcing the ADA.") (internal citations omitted). Iowa courts, therefore, traditionally turn to federal law for guidance in evaluating the ICRA. *King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983). Federal law, however, is not controlling. Iowa courts look simply to the analytical framework utilized by the federal courts in assessing federal law, and federal courts should not substitute the language of the federal statutes for the clear words of the

---

1. In *Reeves,* the Supreme Court was considering a motion for judgment as a matter of law after a jury trial, but the Supreme Court also reiterated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097 (quoting *Liberty Lobby, Inc.,* 477 U.S. at 250–51, 106 S.Ct. 2505). Therefore, the standards articulated in *Reeves* are applicable to the present motion for summary judgment.

ICRA. *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989); *accord Board of Supervisors of Buchanan County v. Iowa Civil Rights Comm'n*, 584 N.W.2d 252, 256 (Iowa 1998) ("In deciding gender discrimination disputes, we adhere to the Title VII analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, 677–79 (1973)") (citing *Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 516 (Iowa 1990)).

Title VII prohibits an employer from "discriminat[ing] against any individual, with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). Congress amended Title VII in 1978 with the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k) *et seq.*, and clarified that the phrase "because of sex" encompasses "pregnancy, childbirth, or related medical conditions." The purpose of the amendment was to ensure that "women affected by pregnancy, childbirth, or related medical conditions [are] treated the same for all employment-related purposes." *Id.; see also Lang v. Star Herald*, 107 F.3d 1308, 1311 (8th Cir.1997) (explaining the expansion of Title VII to cover pregnancy discrimination). Plaintiffs can establish employment discrimination under Title VII using the direct evidence framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or the circumstantial evidence framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Gagnon v. Sprint Corp.*, 284 F.3d 839, 845, 847–48 (8th Cir.2002).

Under the direct evidence framework if the plaintiff produces direct evidence that an illegitimate criterion, such as gender, "played a motivating part in [the] employment decision," the burden shifts to the defendant employer to demonstrate by a preponderance of the evidence that it would have reached the same employment decision absent any discrimination. *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775 (as modified by section 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e–5(g)(2)). If the employer fails to meet this burden, the employee prevails. *Id.*

Alternatively, absent direct evidence of discrimination, the plaintiff can proceed under the familiar burden-shifting standard set forth in *McDonnell Douglas*. Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Cmmty. Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the plaintiff meets this burden and establishes her *prima facie* case by a preponderance of the evidence, a presumption of discrimination arises. *See Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. At this point, the plaintiff is entitled to judgment as a matter of law unless the defendant successfully rebuts the presumption. *See St. Mary's Honor Ctr.*, 509 U.S. at 509, 113 S.Ct. 2742. To rebut this presumption of discrimination, the burden falls to the defendant employer to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. If the defendant meets this burden, "the *McDonnell Douglas* framework—with its presumptions and burdens"—disappears. *St. Mary's Honor Center*, 509 U.S. at 510, 113 S.Ct. 2742. Still, "the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.' *Burdine, supra*, at 256, 450

U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. Moreover, although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, *St. Mary's Honor Center, supra*, at 511, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual,' *Burdine, supra,* at 255, n. 10, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

In this case, Wensel argues that she can establish her claim of employment discrimination through direct evidence and, in the alternative, through circumstantial evidence. She contends that State Farm illegally discriminated against her on the basis of her pregnancy when State Farm did not award her an independent agency contract but instead extended her training period a second time in October of 1999.[2] She contends that she was both constructively discharged and passed over for a promotional opportunity, *i.e.,* did not receive her agency contract, because of her pregnancy.

### *1. Price Waterhouse direct evidence framework*

Under the direct evidence framework enunciated in *Price Waterhouse,* "once [the] plaintiff introduces direct evidence of discrimination, the burden shifts to the employer to show, by a preponderance of the evidence, 'that it would have made the same decision even if it had not taken the plaintiff's [gender] into account." *Ross v. Douglas County, Nebraska,* 234 F.3d 391, 397 (8th Cir.2000) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). Judge Robert W. Pratt, district court judge for the Southern District of Iowa, recently explained the direct evidence framework as follows:

> As modified by section 107 of the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e–5(g)(2), the [*Price Waterhouse* ] model allows for declaratory relief, injunctive relief, attorney's fees and costs once [the plaintiff] meets his initial burden regarding direct evidence. 42 U.S.C. §§ 2000e–5(g)(2)(B)(i). Thus, [the defendant] is liable for discrimination under this model upon direct evidence that it acted on the basis of a discriminatory motive. Whether or not [the defendant] satisfies its burden to show by a preponderance that it would have reached the same employment decision absent any discrimination is only relevant to determine whether the court may award full relief including damages, court ordered admissions, reinstatement, hiring, promotion or other such relief. *Gagnon,* 284 F.3d 839, 847–48, 284 F.3d 839.

---

**2.** Wensel concedes that State Farm did not know of her pregnancy when it extended her training period for the first time in May of 1999. Because there must be evidence of an employer's actual knowledge of a plaintiff's pregnancy at the time it is alleged to have discriminated on the basis of that pregnancy, Wensel does not assert that her first extension in May of 1999 was motivated by discriminatory animus. *See Prebilich Holland v. Gaylord Entertainment Co.,* 297 F.3d 438, 444 (6th Cir.2002) (holding that "in order to establish the fourth prong of a prima facie case of pregnancy discrimination, that is, that there is a nexus between the employee's pregnancy and the adverse employment action, the employee bears the burden of demonstrating that the employer had actual knowledge of her pregnancy at the time that the adverse employment action was taken"). Instead, she limits her allegations of pregnancy discrimination to her second extension in October of 1999, as well as to allegations that State Farm held her to higher performance and productivity standards than it required of her counterparts.

Hence, if the plaintiff can demonstrate a genuine issue of material fact about whether he can meet his initial burden regarding direct evidence, then his claim must survive summary judgment because such direct evidence alone would entitle the plaintiff to recovery of declaratory and injunctive relief as well as attorney's fees and costs. Thus, evidence that the defendant offers on whether it would have subjected the plaintiff to the same employment decision regardless of discriminatory intent cannot defeat a claim altogether, it can only defeat certain remedies such as damages or equitable relief.

*Roberts v. Swift and Co.*, 198 F.Supp.2d 1049, 1059–60 (S.D.Iowa 2002).

■ Here, Wensel argues that two types of statements made by Hecox are direct evidence of discrimination. First, she claims that his statement when she began agent training with respect to waiting five years before starting a family is direct evidence of discriminatory animus. Second, she contends that Hecox's statements regarding other agents' family plans are also direct evidence of discrimination. Specifically, Hecox stated that the pregnancy of a male trainee agent's wife would ultimately harm the trainee's productivity statistics. He made similar comments about the productivity of two other State Farm female independent agents. State Farm does not dispute that these statements were made but rather contends that they do not constitute direct evidence because there is no indication that the statements played a motivating part in the employment decision or are even causally related to it. In addition, State Farm emphasizes that the statements relate to the effect of child-rearing on an employee's productivity in general; thus, they are gender-neutral statements about an issue that potentially affects all employees. State Farm, therefore, asserts that the statements are not discriminatory and not covered by the Pregnancy Discrimination Act.

■■ "Direct evidence is evidence of conduct or statements by persons involved in the decisionmaking process that is sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1018 (8th Cir.1999); *accord Lockridge v. Board of Trustees of Univ. of Ark.*, 294 F.3d 1010 (8th Cir. 2002) (Arnold, Morris Sheppard, J., dissenting) ("Direct evidence is evidence of conduct or statements by persons involved in making the relevant decision directly manifesting a discriminatory attitude."); *Erickson v. Farmland Industries, Inc.*, 271 F.3d 718, 724 (8th Cir.2001) ("The direct evidence required to shift the burden of proof is evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision."); *Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir.2001) (there is direct evidence of discrimination only when there is specific link between challenged employment action and the alleged animus); *Kells v. Sinclair Buick–GMC Truck, Inc.*, 210 F.3d 827, 835 (8th Cir.2000) ("Direct evidence is that which demonstrates a specific link between the challenged employment action and the alleged animus."); *Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 634 (8th Cir.1998) (" 'Direct evidence' " has been interpreted as "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to find that

that attitude was more likely than not a motivating factor in the employer's decision.") (quoting *Thomas v. First Nat'l Bank*, 111 F.3d 64, 66 (8th Cir.1997), which in turn quotes *Kriss v. Sprint Communications Co.*, 58 F.3d 1276, 1282 (8th Cir.1995)). Direct evidence is often described as a "smoking gun"—it is the type of evidence that, on its own, attests to discriminatory intent, such as "an admission by the employer that it explicitly took actual or anticipated pregnancy into account in reaching an employment decision." *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 421 (1st Cir.1996). Direct evidence, therefore, is not " 'stray remarks in the work place, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself' " because those types of statements do not support an inference that the speaker's discriminatory attitude is sufficiently related to the adverse employment action in question. *See Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1157 (8th Cir.1999) (quoting *Fast v. Southern Union Co.*, 149 F.3d 885, 889 (8th Cir.1998)) (internal quotation marks and citation marks omitted by the *Breeding* court); *see also Simmons v. Oce-USA, Inc.*, 174 F.3d 913, 915 (8th Cir. 1999) (" 'Not all comments that may reflect a discriminatory attitude are sufficiently related to the adverse employment action in question to support such an inference.' ") (quoting *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999)).

This court explored the direct evidence landscape in detail in *Bauer v. Metz Baking Co.*, 59 F.Supp.2d 896, 901–06 (N.D.Iowa 1999). In *Metz Baking Co.*, the court examined Eighth Circuit precedent and concluded that a determination of whether a plaintiff's evidence of discrimination constitutes direct evidence requires an analysis of (1) the speaker; (2) the content; and (3) the causal connection between the comments and the adverse employment decision. *Id.* at 903.

### a. The speaker

The court turns first to the identity of the speaker of the comments allegedly constituting direct evidence of discrimination because "[d]irect evidence is evidence of conduct or statements by persons involved in the decisionmaking process." *Kerns*, 178 F.3d at 1017; *accord Simmons*, 174 F.3d at 915; *Walton*, 167 F.3d at 426. Here, Hecox made both the statements that Wensel contends constitute direct evidence. While there is some dispute in the record as to whether Hecox was the "final decisionmaker" regarding whether and when Wensel received her independent agent contract, Hecox is Wensel's supervisor and was a key member of her management team. State Farm asserts that Barton, not Hecox, was the final decisionmaker, but this argument ignores that the speaker or actor need not be *the* decisionmaker; this first step in the direct evidence analysis requires only that the speaker be *"involved* in the decisionmaking process." *Kerns*, 178 F.3d at 1017 (emphasis added). Because it is undisputed that Hecox was involved in the evaluation process, the court finds that, at a minimum, there is a genuine issue of material fact as to whether Hecox was a "person[ ] involved in the decisionmaking process" that led to State Farm's second extension of Wensel's training period. *See id.*

### b. The content

Next, the court turns to the content of the comments specifically identified by Wensel as her "direct evidence" of discrimination. As this court noted in *Metz Baking Co.*, "[t]his criterion is obviously relevant, because '[d]irect evidence is evidence of conduct or statements by persons in-

volved in the decisionmaking process *that is sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision.'"* Metz Baking Co., 59 F.Supp.2d at 904 (quoting *Kerns,* 178 F.3d at 1017) (as emphasized in *Metz Baking Co.*). Here, Hecox's comments are: (1) that Wensel should wait at least five years before starting a family; and (2) that pregnancy and child-rearing harm an agent's ability to meet his or her productivity goals. Wensel argues that these comments demonstrate a discriminatory attitude against pregnant employees and suggest that pregnancy is disfavored because of its detrimental effect on productivity. However, State Farm points out that the comments are not directed at pregnancy, but rather at child-rearing. Thus, it claims that Hecox's statements do not evince discriminatory animus toward pregnancy. In support of this argument that Hecox's statements were gender-neutral and, thus, not violative of the PDA, State Farm points out that Hecox's second comment was directed at a male trainee agent whose wife was expecting a child.

In *Piantanida v. Wyman Center, Inc.,* 116 F.3d 340 (8th Cir.1997), the Eighth Circuit Court of Appeals addressed a similar issue. In that case, the employee sued her employer for sex discrimination under the PDA, alleging that she was discriminated against because she was a "new mom." *Id.* at 340. The plaintiff in *Piantanida* was demoted while she was on maternity leave after the employer discovered that she had been dilatory in several of her assigned tasks. *Id.* at 341. When the plaintiff spoke with her supervisor about the demotion, her supervisor told the plaintiff that "she was being given a position 'for a new mom to handle.'" *Id.* (quoting plaintiff's deposition). The plaintiff agreed that her demotion was not based on her pregnancy or her maternity leave. *Id.* at 341. Thus, the sole question

before the Eighth Circuit was whether "discrimination based on one's status as a new parent is . . . prohibited by the PDA." *Id.* In answering that this type of claim was not cognizable under the PDA, the Eighth Circuit reasoned:

In examining the terms of the PDA, we conclude that an individual's choice to care for a child is not a "medical condition" related to childbirth or pregnancy. Rather, it is a social role chosen by all new parents who make the decision to raise a child. While the class of new parents of course includes women who give birth to children, it also includes women who become mothers through adoption rather than childbirth and men who become fathers through either adoption or biology. An employer's discrimination against an employee who has accepted this parental role— reprehensible as this discrimination might be—is therefore not based on the gender-specific biological functions of pregnancy and child-bearing, but rather is based on a gender-neutral status potentially possessible [sic] by all employees, including men and women who will never be pregnant. *Cf. Krauel v. Iowa Methodist Med. Ctr.,* 95 F.3d 674, 679– 80 (8th Cir.1996) (holding that an employer's denial of fertility treatments under insurance benefits is not a violation of PDA, and noting that "[p]otential pregnancy, unlike infertility, is a medical condition that is sexrelated because only women can become pregnant. In this case . . . the policy of denying insurance benefits for treatment of fertility problems applies to both female and male workers and thus is gender-neutral"); *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 738 (7th Cir.1994) (holding that PDA plaintiff's complaint, that she was terminated because her employer did not believe that she would return from her maternity leave, was not a violation

of Title VII, and noting that a male employee on medical leave could also be terminated due to employer's fear that he would not return).

*Id.* at 342.

In Wensel's case, Hecox's comments regarding the effect of child-rearing on an agent's productivity were clearly not based on gender, as evinced by the fact his comments were directed toward a male agent as well as toward female agents. This type of discrimination, therefore, as in *Piantanida*, is not prohibited by the PDA because the effect of parenthood on an employee's productivity is not "because of or on the basis of pregnancy, childbirth, or related medical conditions." *See* 42 U.S.C. § 2000e(k). Wensel would have the court infer that this type of comment, when juxtaposed against Hecox's earlier statement that Wensel should wait five years before starting a family, suggests a strong attitude and animus against pregnancy. However, it is this necessity to make an inference that takes Hecox's child-rearing comments outside the realm of "direct evidence."

█ "The direct evidence required to shift the burden of proof is evidence of conduct or statements by persons involved in making the employment decision *directly manifesting a discriminatory attitude*, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision." *Farmland Industries*, 271 F.3d at 724 (citing *Price Waterhouse*, 490 U.S. at 276–77, 109 S.Ct. 1775) (O'Connor, J., concurring) (emphasis added). The type of discriminatory attitude evinced by Hecox's child-rearing/productivity statements, while callous and perhaps blind to reality, do not— standing alone—directly manifest a discriminatory attitude that is prohibited by the PDA. Child-rearing affects both mothers and fathers and is not "because of

sex"; this comment and similar child-rearing comments, therefore, do not constitute direct evidence because, *standing alone,* they are unconnected to a medical condition related to childbirth or pregnancy.

### c. Causation

In addition, even if Hecox's statement directed toward Wensel could be interpreted to encompass pregnancy or a related medical condition of the type of illegitimate criterion proscribed by the PDA, and did not merely reference the added burdens of parenthood and its effect on productivity, the statement, standing alone, lacks any causal connection to the adverse employment action in this case, which occurred over one year after the comment was made.

Because not all statements reflecting a discriminatory animus sufficiently support an inference of discriminatory intent, the plaintiff bears the burden of demonstrating a causal link between the offered evidence and the adverse employment action. *See Metz Baking Co.,* 59 F.Supp.2d at 905 ("Where, as here, comments are not 'close in time' to an adverse employment decision, the plaintiff 'must establish a causal link between the comments and his [or her] termination.'") (quoting *Walton,* 167 F.3d at 426–27) (citing *Simmons,* 174 F.3d at 915). In *Metz Baking Co.,* an age discrimination employment case, this court held that comments regarding retirement were not direct evidence of discriminatory intent because they lacked a causal connection to the adverse employment action. *Id.* at 905–06. The reasoning this court applied in *Metz Baking Co.* applies with equal force to Wensel's case: "Bauer has attempted to forge such a 'causal link' between Kelly's questions and the decision to terminate her several months later by asserting that Kelly stepped up her criticisms of Bauer with the goal of getting her terminated after Bauer expressed no interest in retiring in response to Kelly's ques-

tions. However, Metz Baking points out that the *comments were not made in connection with any disciplinary meeting or action or in the context of any other employment* evaluation...." *Id.* (emphasis added). Here, too, Hecox's comment was not made in the context of any adverse employment action but instead was made after Wensel was accepted to enter the TA program. Wensel attempts to link this comment to an overriding discriminatory animus pervading State Farm's decision-making process by asserting that Hecox's later child-rearing/productivity statements are reflective of an anti-pregnancy attitude. Nevertheless, as in *Metz Baking Co.*, "[t]he chain of inferences upon which [Wensel's] 'causal link' argument relies is itself indicative of the fact that [Hecox's comments] simply are not 'direct' evidence of discriminatory intent." *Id.* at 906 (quoting *Simmons*, 174 F.3d at 916). The causal link here, too, is, in plainer words, too tenuous to constitute the type of "smoking gun" that is the hallmark of direct evidence.

Therefore, State Farm is entitled to summary judgment that Wensel has not presented any "direct evidence" of gender discrimination and, thus, cannot proceed under the *Price Waterhouse* paradigm or obtain the relief that would flow from direct proof of discrimination. The court must next determine, however, whether Wensel has come forward with sufficient circumstantial evidence of discriminatory intent to survive summary judgment and proceed to a jury trial because a plaintiff may prove discrimination either directly or indirectly. *See Gagnon*, 284 F.3d at 845, 847–48. The court turns now to that inquiry.

### 2. *Circumstantial evidence and the McDonnell Douglas burden-shifting paradigm*

As noted above, the analytical framework announced in *McDonnell Douglas*

enables a plaintiff to prove illegitimate discrimination in the absence of direct evidence by establishing a *prima facie* case of discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 252–253, 101 S.Ct. 1089. Once the plaintiff meets this burden, a presumption of discrimination arises. *See Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. Unless the defendant rebuts this presumption by producing evidence that it had a legitimate business justification for the adverse employment action taken against the plaintiff, the plaintiff prevails. *See St. Mary's Honor Ctr.*, 509 U.S. at 509, 113 S.Ct. 2742. However, if the defendant does produce a legitimate business reason for its action, the plaintiff may still prevail " 'by showing that the employer's proffered explanation is unworthy of credence.' " *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089).

Wensel asserts two discrete claims of gender discrimination: disparate treatment through constructive discharge and employment discrimination where the adverse action claimed is her failure to receive a promotion. The court will address each in turn.

### a. *Disparate treatment through constructive discharge*

■ To prevail on a sex discrimination claim under a disparate treatment theory, Wensel must establish a *prima facie* case by presenting evidence that demonstrates: "(1) she was a member of a protected group; (2) she was qualified for her position; and (3) she was discharged under circumstances giving rise to an inference of discrimination." *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574 (8th Cir.1997) (citing *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)). In this case, it is undisputed that, as a pregnant female, Wensel was a mem-

ber of a protected group. In addition, for purposes of this motion, State Farm concedes that she was qualified for her position. However, State Farm vehemently disputes Wensel's contention that she was constructively discharged and argues that it is entitled to summary judgment on this ground. Wensel, on the other hand, asserts that she was constructively discharged when she was passed over a second time for independent contractor status.

■ When, as here, an employer does not affirmatively terminate an employee, the employee "must offer evidence sufficient to establish that she was constructively discharged." *Hanenburg*, 118 F.3d at 574. "The term 'constructive discharge' refers to the situation in which an employee is not fired but quits, but in circumstances in which the working conditions have made remaining with this employer simply intolerable." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir.1998) (citations omitted). This court has previously addressed the concept of constructive discharge, in *Cherry v. Menard, Inc.*, 101 F.Supp.2d 1160 (N.D.Iowa 2000):

> A constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable and thus forces him to quit his job. *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir.1999) (citing Kimzey, 107 F.3d at 574); *see also Johnson v. Runyon*, 137 F.3d 1081, 1083 (8th Cir.) (internal quotations omitted), *cert. denied*, 525 U.S. 916, 119 S.Ct. 264, 142 L.Ed.2d 217 (1998) ("A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit."); *Summit v. S–B Power Tool*, 121 F.3d 416, 421 (8th Cir.1997) (internal quotations omitted), *cert. denied*, 523 U.S. 1004, 118 S.Ct. 1185, 140 L.Ed.2d 316 (1998) (citing same). The intent element is satisfied

by a demonstration that quitting was "a reasonably foreseeable consequence of the employer's discriminatory actions." *Id.* The employee has an obligation to act reasonably by not assuming the worst and not jumping to conclusions too quickly. *See Howard v. Burns Bros., Inc.*, 149 F.3d 835, 841–42 (8th Cir.1998).

" '[I]ntolerability of working conditions is judged by an objective standard, not the [employee's] subjective feelings.' " *Gartman v. Gencorp, Inc.*, 120 F.3d 127, 130 (8th Cir.1997) (quoting *Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th Cir.1996)). First, the conditions created by the employer must be such that a reasonable person would find them intolerable. *See Gartman*, 120 F.3d at 130; *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996); *Parrish v. Immanuel Medical Ctr.*, 92 F.3d 727, 732 (8th Cir.1996); *Allen*, 81 F.3d at 796; *Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1420 (8th Cir.1995); *Smith*, 38 F.3d at 1460; *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 284 (8th Cir.1993). Second, the employer's actions "must have been deliberate, that is, they 'must have been taken with the intention of forcing the employee to quit.' " *Delph*, 130 F.3d at 354 (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981)); *Gartman*, 120 F.3d at 130; *Tidwell*, 93 F.3d at 494; *Parrish*, 92 F.3d at 732; *Allen*, 81 F.3d at 796; *Smith*, 38 F.3d at 1461; *Hukkanen*, 3 F.3d at 284. The Eighth Circuit Court of Appeals has explained that, "in the absence of conscious intent . . . , the intention element may nevertheless be proved with a showing that the employee's 'resignation was a reasonably foreseeable consequence' of the [discriminatory or retaliatory conduct]." *Delph*, 130 F.3d at 354 (quoting *Hukkanen*, 3

F.3d at 285); *Gartman,* 120 F.3d at 130 (also citing *Hukkanen* ). Finally, "to act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly"; therefore, "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir.1995).

*Cherry,* 101 F.Supp.2d at 1187–88.

In this case, State Farm argues that Wensel was not constructively discharged because (1) a reasonable person would not find her working conditions so intolerable as to require resignation; and (2) she failed to allow State Farm a reasonable opportunity to correct deficiencies. The court, therefore, will address each of these disputed elements in turn.

▪ *i. Intolerableness of working conditions.* As noted above, "[a]n employee is constructively discharged 'when an employer deliberately renders the employee's working conditions intolerable and thus forces [her] to quit [her] job.'" *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 497 (8th Cir.1995) (quoting *Smith v. World Ins. Co.,* 38 F.3d 1456, 1460 (8th Cir.1994)) (alterations provided by *West* court). To determine whether the working conditions were intolerable, the court must apply an objective standard. *Id.* "'An employee may not be unreasonably sensitive to [her] working environment. A constructive discharge arises only when a reasonable person would find [her working] conditions intolerable.'" *Id.* (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981)) (alterations provided by *West* court). The question here, therefore, is whether it was reasonable for Wensel to conclude in October of 1999 that she would never be granted her independent agent contract and, consequently, had no alternative other than to leave the TA program even though State Farm never asked for her resignation or told her that she would not be granted an independent agent contract.

In *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151 (8th Cir.1999), the Eighth Circuit Court of Appeals addressed a similar contention by an age and sex discrimination plaintiff. In *Breeding,* the plaintiff claimed, *inter alia,* that her poor performance reviews and failure to receive a promotion created intolerable working conditions, prompting her resignation. *Id.* at 1159–60. Rejecting her argument, the *Breeding* court held that "[t]he working atmosphere was not ideal, but 'a feeling of being unfairly criticized or [having to endure] difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.' *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994). There is similarly no evidence that Ms. Breeding was denied a promotion on the basis of age or sex, and in any event, *losing a single promotional opportunity is not a sufficient reason to quit or to constitute constructive discharge.*" *Id.* at 1160 (citing *Summit v. S–B Power Tool (Skil Corp.),* 121 F.3d 416, 421 (8th Cir.1997)) (emphasis added); *accord Tokheim Corp.,* 145 F.3d at 956 ("[A] reasonable employee would not have considered a failure to be promoted an event that made her working conditions intolerable."); *Tidwell,* 93 F.3d at 495 (concluding that the plaintiff's loss of "a single promotion opportunity to an arguably better qualified candidate" was not a circumstance in which "the overwhelming compulsion to quit that is necessary for constructive discharge is ... created"). Similarly, Wensel asserts that her being passed over for an agency contract the second time was discriminatory. Thus, like the *Breeding* plaintiff, she argues that the loss of a single promotional opportunity created intolerable working conditions. However, the Eighth Circuit rejected that

argument in *Breeding,* and this court is compelled to reach the same conclusion.

Furthermore, this court's finding that a reasonable person would not find Wensel's working conditions intolerable is bolstered by Wensel's own actions. She claims that the extension of her training period in October of 1999 was the impetus for her decision to resign because it was at that point she concluded her pregnancy was disfavored within the company. Still, she did not resign until January 10, 2000, and her resignation did not take effect until February 29, 2000. Her actions in continuing to work for State Farm for approximately four months demonstrate that not even she considered her working conditions to be so intolerable that she was required to resign. In short, her actions demonstrate that she lacked "the overwhelming compulsion to quit that is necessary for constructive discharge." *See Tidwell,* 93 F.3d at 495.

Wensel argues, however, that her working conditions at State Farm were more insufferable than is immediately apparent from the mere second extension of her training period. Instead, she argues that her performance reviews were based on amorphous criteria and that she was at least as qualified, if not more qualified, than other TAs who were receiving their independent agency contracts while she was forced to remain in limbo. She bases her argument, in part, on this court's holding in *Hennick v. Schwans Sales Enterprises, Inc.,* 168 F.Supp.2d 938 (N.D.Iowa 2001). In *Hennick,* this court addressed the issue of whether a sex discrimination plaintiff's assertions of being *repeatedly* passed over for promotions in favor of less qualified males were sufficient to generate a jury question as to whether the employer intentionally made her working conditions so intolerable that it was reasonably foreseeable that she would quit. *Id.* at 957–58. This court denied summary judgment and based its conclusion on the Eighth Circuit's decision in *Tidwell,* which held that " 'where a better qualified employee is repeatedly turned down for promotions in favor of inferior candidates, we can foresee that a negative and degrading atmosphere sufficient to constitute a constructive discharge might exist.' " *Id.* at 957 (quoting *Tidwell,* 93 F.3d at 495).

The facts in Wensel's case are clearly distinguishable from *Hennick* and *Tidwell.* As previously stated, Wensel does not allege that she was repeatedly passed over for her agency contract while inferior candidates received contracts. It is undisputed that State Farm was unaware of her pregnancy the first time it decided to extend Wensel's training period. Wensel does not, therefore, allege that this decision was tainted by any discriminatory animus. She alleges only that her second extension was unlawful discrimination. However, she resigned prior to the time of her would-be third review. Therefore, Wensel was only passed over for an agency contract one time, which, as a matter of law, does not create working conditions that were so intolerable that she was forced to resign. This is especially true in light of Wensel's admitted deteriorating performance during the time period leading up to her second extension. *See Summit,* 121 F.3d at 421 (finding no constructive discharge where there was no evidence that sex discrimination, rather than performance problems, prompted the reprimands).

Because Wensel cannot show that her working conditions were so intolerable that a reasonable person would feel forced to resign, State Farm is entitled to summary judgment on her constructive discharge claim. However, even assuming that her working conditions were intolerable, the court finds that State Farm would still be entitled to summary judgment on this

claim because the record is devoid of any evidence that Wensel gave State Farm an opportunity to respond to the intolerableness.

### ii. Opportunity to respond.

As a sub-set of the reasonableness analysis, "an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." *Tidwell*, 93 F.3d at 494 (citing *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir.1995)). The Seventh Circuit Court of Appeals aptly discussed the rationale underlying this requirement in *Lindale v. Tokheim Corp.*, 145 F.3d 953 (7th Cir.1998):

In some situations, the standard of reasonableness will require the employee who wants to make a successful claim of constructive discharge to do something before walking off the job. The reason is not that there is a doctrine of exhaustion of remedies, which would, as we said, mean that the employee might have to sue twice to preserve his right to sue at all. The reason, rather, is that passivity in the face of working conditions alleged to be intolerable is often inconsistent with the allegation. The significance of passivity is thus evidentiary. Suppose a worker has just been assigned to a job that he believes to be dangerous to his health, but the work force is unionized and he can file a grievance complaining about the assignment. His failure to do so may be compelling evidence that he, or a reasonable person in his situation, would not actually have found conditions in his new assignment unbearable. And likewise if, in a nonunionized shop, he is given an unreasonable order by his foreman and instead of complaining to the foreman's superior walks off the job and claims he was constructively discharged. Failure to exhaust may show that the employee didn't really consider his working conditions intolerable or

may deny the employer a reasonable opportunity to correct the situation without facing a lawsuit.

*Id.* at 955–56 (internal citations omitted).

Here, it is undisputed that Wensel did not complain to anyone at State Farm about her perceptions of gender and pregnancy discrimination. In November of 1999, Wensel traveled to Lincoln, Nebraska to meet with Dave Harris, State Farm's Regional Vice President for the West Central Region. According to Wensel, her stated intentions in meeting with Harris were to discuss her perception of unfairness in that the TAs in North Dakota, who were not under Barton's supervision, were not being held to the same standards as the TAs in Iowa, who were under Barton's supervision. She did not raise any concerns about alleged discriminatory treatment based on her gender and/or pregnancy despite the fact she alleges that she determined in October of 1999 that her pregnancy was the reason her training period was extended.

In addition, State Farm notes in its brief in support of its motion for summary judgment that it maintains a "Code of Conduct Line." This telephone line is presumably intended as a medium for reporting, among other things, discriminatory conduct on the part of State Farm employees. State Farm stated, and Wensel did not refute, that Wensel did not utilize this means of reporting her suspicions of discrimination. The Eighth Circuit Court of Appeals upheld the dismissal of a Title VII plaintiff's constructive discharge claim in *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 685–86 (8th Cir.2001), for, in part, the precise reason at play here—the plaintiff did not utilize the employer's established means of lodging complaints against the company despite its existence.

In *Sowell*, the plaintiff alleged that her employer's institution of a policy that re-

quired employees to wear pagers at night and on weekends in order to be available for emergency repairs was discriminatory because of her need to care for her newborn infant. *Id.* at 685. The *Sowell* court held, *inter alia*, that the plaintiff was not constructively discharged because she "failed to avail herself of the channels of communication provided by Alumina [her employer] to deal with such complaints." *Id.* at 686; *accord Knowles v. Citicorp Mortgage, Inc.*, 142 F.3d 1082, 1086 (8th Cir.1998) (affirming summary judgment for employer on constructive discharge claim because employee did not pursue internal grievance procedure); *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1247–48 (8th Cir.1998) (reversing constructive-discharge judgment in part because employee had avenue of redress within company and failed to use it). The rationale underlying this rule is simple: " 'society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships.' " *Marion Merrell Dow, Inc.*, 54 F.3d at 498 (quoting *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 66 (5th Cir. 1980)).

Unlike the plaintiffs in *Knowles* and *Coffman*, Wensel failed to lodge a single complaint regarding discriminatory treatment. In *Knowles v. Citicorp Mortgage, Inc.*, 142 F.3d 1082 (8th Cir.1998), the plaintiff alleged that his employer violated the Veterans' Reemployment Rights Act by constructively discharging him. He felt that his immediate supervisor made the plaintiff's working conditions intolerable with the intent of forcing him to quit because of his military status. *Id.* at 1086. While the plaintiff expressed these concerns to his supervisor's supervisor, he did not pursue the company's internal grievance procedure, nor did he mention his concerns to anyone in the company's human resources department at the time of his resignation. *Id.* Instead, when asked why he was resigning, he stated that he was displeased with his relocation package. *Id.*

This fact pattern surrounding the *Knowles* plaintiff's resignation is remarkably similar to Wensel's case. Wensel met with Harris, yet did not mention her concerns that now form the basis of her allegations of discrimination. Further, in her resignation letter, she stated that she was resigning for the following reasons:

> I feel that with the ever-changing rules and requirements placed upon me that my success within the program has been made unattainable. No clear completion date has ever been set. Therefore, I can no longer risk the investment of my family's time and resources on such an unclear future.

[Deft.'s App., Tab 36, at 286].

Thus, as in *Knowles*, Wensel failed to inform her employer of her complaints, and, as a result, she afforded State Farm no opportunity to address it. The facts of Wensel's case are even more compelling than in *Knowles*, insofar as the *Knowles* plaintiff reported his concerns but failed to pursue any other action, whereas Wensel made no such complaints. *See Knowles*, 142 F.3d at 1086. Therefore, *Knowles* supports this court's conclusion that Wensel's failure to, at a minimum, apprise State Farm of her concerns that she was being discriminated against deprived State Farm of any opportunity to address the alleged discrimination, and this failure precludes her from claiming that she was constructively discharged.

*Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241 (8th Cir.1998) provides a similar analogy. In *Coffman*, the Eighth Circuit held that the plaintiff failed to present sufficient evidence for a jury to find that a reasonable person in her position would have found that the conditions of her em-

ployment were intolerable. *Id.* at 1247. This was so because she "was not an employee who felt she had no place to turn when faced with unlawful discrimination. She knew that she could report any allegations of retaliatory action directly to McNew [the personnel representative] and up the chain of responsibility...." *Id.* In *Coffman,* the plaintiff reported some of the retaliatory conduct to the personnel representative, as well as to a manager. *Id.* at 1244. When the plaintiff first announced her resignation, she reiterated her contention that she was being retaliated against because she filed a sexual harassment complaint against her supervisor. *Id.* The company investigated her claims, concluded her allegations resulted from miscommunication between the plaintiff and her supervisor, and suggested that the problem be resolved through the use of a facilitator. *Id.* However, the plaintiff did not want to use either of the two facilitators that her employer recommended and resigned. *Id.*

The Eighth Circuit held that, particularly in light of the employer's previous corrective action on her sexual harassment complaint, the plaintiff was not entitled to conclude that her retaliation complaint would not lead to similar action. *Id.* at 1247–48. Because she failed to allow her employer an opportunity to remedy the complained-of retaliatory conduct, the court ruled that a reasonable person in her position could not have found that her working conditions were intolerable. *Id.* at 1247. While there is no evidence that Wensel knew of the existence of the Code of Conduct Line, she did not dispute State Farm's assertion that it was available. In any event, she clearly knew of channels within the State Farm organizational structure through which to lodge complaints, as evidenced by her meeting with Harris. However, because she did not allow State Farm to address her allegations of discrimination before tendering

her resignation—not to mention during the four month interim between the time she tendered her resignation and when her resignation took effect—she cannot now set forth a successful claim of constructive discharge. Accordingly, State Farm is entitled to summary judgment on this claim as well.

### b. *Pregnancy discrimination: Failure to receive independent agent contract*

 Wensel also asserts a claim of disparate treatment pursuant to both Title VII and the ICRA that is based on State Farm's failure to grant her an independent agency contract, while granting such contracts to similarly situated, equal or lesser qualified male and nonpregnant females. The court has carefully reviewed the record on this claim and finds that, while this case presents a close call, the plaintiff is entitled to proceed to a jury trial on this claim.

To establish a submissible *prima facie* case of employment discrimination under the *McDonnell Douglas* analysis, the plaintiff's usual burden is to show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the job he or she was performing; (3) the plaintiff suffered adverse employment action, or was discharged; and (4) a nonmember of the protected class replaced the plaintiff or was not subjected to the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *accord Breeding,* 164 F.3d at 1156 ("[A plaintiff] must demonstrate (1) that she is within the protected class; (2) that she was qualified to perform her job; (3) that she suffered an adverse employment action; and (4) that nonmembers of her class (persons under 40 in the ADEA context or of the opposite gender in the Title VII sex discrimination context) were not treated

the same.") (citing *Kneibert v. Thomson Newspapers, Michigan Inc.*, 129 F.3d 444, 451 n. 4 (8th Cir.1997) (defining the prima facie case in the ADEA context); *Lyoch v. Anheuser–Busch Cos.*, 139 F.3d 612, 614 (8th Cir.1998) (defining the *prima facie* case in Title VII context)). "The elements of a prima facie case are not inflexible and vary slightly with the specific facts of each case." *Breeding*, 164 F.3d at 1156 (citing *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990–91 (8th Cir.1998)). In this case, it is, again, undisputed that Wensel is a member of a protected group, and State Farm concedes for purposes of this motion that she was qualified. State Farm does not, however, concede that Wensel was subject to an adverse employment action, nor does it agree that males and nonpregnant females who received independent agency contracts were similarly situated to Wensel. In addition, State Farm asserts that it extended Wensel's training period because her productivity and management style needed improvement. Under the burden shifting paradigm, "[i]f the defendant advances such a nondiscriminatory reason, the plaintiff must prove that defendant's proffered reasons are a pretext for illegal discrimination." *Thomas v. Runyon*, 108 F.3d 957, 959 (8th Cir.1997) (citing *Ruby v. Springfield R–12 Pub. Sch. Dist.*, 76 F.3d 909, 911 (8th Cir.1996)). State Farm contends that Wensel has failed to rebut this proffered legitimate, nondiscriminatory reason for extending her training period and, therefore, that State Farm is entitled to summary judgment on this claim.

*i. Did Wensel suffer an adverse employment action?* When Wensel resigned from the TA program, she returned to her previous position at State Farm in the claims department through the "path back" option, which provided trainee agents the opportunity to leave the TA program and return to a former position within State Farm. State Farm contends that, because she was approved for "path back," returned to her position as a fire claims specialist with no break in service or reduction in pay or benefits, there was no adverse employment action taken against her. *See, e.g., LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 691 (8th Cir.2001) ("[A]n adverse employment action is exhibited by a material employment disadvantage, such as change in salary, benefits, or responsibilities.") (citations omitted). However, Wensel rejects this assertion that her return to the claims department was not a demotion because of the pay difference had she received her independent agency contract, as well as the independence and prestige that accompany being an independent agent.

Moreover, she rightly points out that the extraordinary investment put into TA selection and training would be absurd if State Farm itself did not view the awarding of an agency contract as an advancement within the company. State Farm's argument that there was no constructive discharge, and no change in pay, benefit, salary, or seniority upon her return to the claims department and, therefore, no adverse employment action misses the mark because the adverse employment action claimed by Wensel is not the transfer from TA status to the claims department, but rather is her failure to receive her contract, which she contends forced her to return to the claims department. When viewed in this light, there is indeed a change in, at a minimum, pay and prestige. Thus, independent agent status is equivalent to a promotion from a claims department position, and the failure to receive a promotion can serve the basis of a finding of an adverse employment action. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999) (holding that adverse employment action includes "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand") (citations

omitted); *Hennick*, 168 F.Supp.2d at 955 (rejecting employer's contention that failure to place plaintiff in training program for different position was not an adverse employment action); *cf. Hunt v. City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000) (denial of raise is adverse employment action). The court, therefore, finds that the second extension of Wensel's training period, while perhaps justified, was adverse. Consequently, Wensel has generated genuine issues of material fact on the third element of her *prima facie* case of discrimination by showing that the extension of her training period was an adverse employment action.

### ii. Were other agents who received contracts similarly situated to Wensel?

State Farm also asserts that Wensel cannot establish a *prima facie* case of employment discrimination because those agents who received their independent agency contracts within less time than Wensel were not similarly situated to her. State Farm's argument is based on the fact that the agents who Wensel claims were less qualified than she and yet received contracts were not under Barton's supervision, and it is undisputed that regional vice presidents were responsible for agency activities within specified areas. Thus, because Barton was free to establish criteria for trainee agents in his own territory, State Farm contends that trainee agents outside of Barton's region, *i.e.*, outside of Iowa, are not similarly situated.

State Farm's argument in this regard has merit. While "[a] plaintiff may prove allegations of disparate treatment by demonstrating that she was treated less favorably than similarly situated employees outside the plaintiff's protected class[,][t]he test for whether employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one." *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 568 (8th Cir.2000) (internal cita-

tions omitted). In *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir.2000), the Eighth Circuit Court of Appeals found that the plaintiff failed to establish her *prima facie* case of employment discrimination because she, among other deficiencies, could not identify any similarly situated employees. The court held that "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (citing *Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 487–88 (8th Cir.1998)). In *Runyon*, the plaintiff was not similarly situated to her co-workers because the plaintiff, who was terminated for repeated acts of violence and threats against her co-workers, had a history of violent attacks, while the identified co-workers, who were not terminated for engaging in fights, either had no history of violence and/or did not work under the plaintiff's supervisor. *Id.*

In Wensel's case, she seeks to compare her productivity to all 500 agents in her region. She states that, as among all of these agents, her performance was exceptional. However, regions are sub-divided into territories, and territories are headed by vice presidents, such as Barton, who supervise agent activities within their specified areas. Wensel offers a second comparison, more focused in scope, by identifying her five classmates as similarly situated. However, of her classmates, only Huff, Kent, and Hernandez were in Iowa and, consequently, under Barton's supervision. Henning's office was in Nebraska, and Gotta's office was in North Dakota.

Because State Farm's vice presidents independently established criteria for their area's trainee agents, TAs not in Iowa and under Barton's supervision are not similarly situated to Wensel and,

therefore, do not provide a proper comparison in her disparate treatment claim. *See id.; see also Kimba v. Pizza Hut of Am., Inc.*, 242 F.3d 375, 2000 WL 1852622, at *1 (8th Cir. Dec.19, 2000) (per curiam) (table op.) (affirming summary judgment against plaintiff where plaintiff's comparison of non-disciplined co-workers worked in different restaurants and under different supervisors and, therefore, were not similarly situated). Thus, in order to establish her *prima facie* case of disparate treatment, Wensel must show that she was treated differently or subjected to different standards than Huff, Kent, and/or Hernandez.

As between Huff, Kent, and Hernandez, only Huff received an independent contract, which took place at the same time Wensel's training program was extended— or, in other words, after 15 months in the program. Kent was asked to leave the program after 24 months, and Hernandez voluntarily left after only 13 months. Thus, only Huff was arguably treated better than Wensel. Wensel has offered for comparison the rankings of her classmates and of herself on this motion for summary judgment. However, Wensel notes that Huff's statistics are "mysteriously absent" from the documents turned over in discovery. Thus, it is impossible to compare Wensel's performance to Huff's. From these rankings, however, it is clear that Wensel's performance was, at a minimum, acceptable. Because the court draws all reasonable inferences in favor of the non-movant on a motion for summary judgment, it is not a difficult leap to infer that Wensel's performance was comparable to Huff's based on her statistics and the failure of State Farm to provide Huff's statistics. Because the court concludes that Huff was similarly situated, State Farm is not entitled to summary judgment on the ground that Wensel has not identified any similarly situated non-protected class employees who received their contracts within less time than Wensel.

In addition, Wensel has set forth sufficient evidence to generate a fact question as to the importance of the three-phase criteria, relative to Huff and herself. As noted above, Barton replaced the Agency 2000 program and implemented the three-phase program, which included new competency requirements, sometime during the middle of Wensel's training program. She states in her affidavit that Barton stressed the new competencies with her, while not holding Huff accountable for them. State Farm has offered no evidence to demonstrate when and how it communicated the new competencies implemented with the three-phase program and, therefore, has not attempted to rebut Wensel's allegations in this regard. A jury could infer that holding similarly situated employees accountable for different performance goals was a discriminatory employment practice. *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 497 (8th Cir.1998) (affirming jury verdict in age discrimination case where supervisors judged employee's work by criteria different in kind and quantum from that of other employees, and, after employee was placed on formal discipline, supervisor created goals for him that were unattainable as measured by the accomplishments of other employees). Therefore, the court finds that State Farm is not entitled to summary judgment on its similarly situated argument on this ground as well.

***iii. Legitimate business justification and proof of pretext.*** State Farm argues that, even if Wensel can establish a *prima facie* case of disparate treatment, it is entitled to summary judgment on the ground that it had a legitimate business reason for extending her training period: her performance did not yet justify an independent contract. Namely, her productivity had

declined in the months leading up to her October of 1999 review and she had not met all of her production goals. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. State of Missouri Dept. of Social Servs., Div. of Family Servs.,* 188 F.3d 932, 936 (8th Cir.1999) (citing *Buchholz v. Rockwell Int'l Corp.,* 120 F.3d 146, 150 (8th Cir. 1997); *Hayes v. Invesco, Inc.,* 907 F.2d 853, 855 (8th Cir.1990)).

Here, Wensel concedes that her productivity statistics had declined because she lost two of her three staff members in August of 1999 and, furthermore, agrees that she had not met each of her productivity goals. However, she notes that all of her performance evaluations were extremely positive and that productivity goals were intentionally set high in order to increase motivation and that State Farm did not expect that all goals would be met each week. She argues that she has come forward with sufficient evidence of pretext to defeat the defendant's burden of production and to proceed to a jury trial on her disparate impact claim.

 Positive performance evaluations in the face of an adverse employment action can provide proof of pretext when an employer relies on poor performance as its justification for its action, such as is the case here. *See, e.g., Nitschke v. McDonnell Douglas Corp.,* 68 F.3d 249, 252 (8th Cir.1995) ("If McDonnell Douglas had offered incompetence as the reason for Nitschke's termination, then evidence showing that Nitschke was competent would prove pretext.") (citations omitted); *Frieze v. Boatmen's Bank,* 950 F.2d 538, 541 (8th Cir.1991) ("An employer rating an employee as competent discredits the employer's stated reason for discharging the employee ... only when the employer's stated reason for discharge is the employ-

ee's general incompetence.") (citing *La Montagne v. American Convenience Prods., Inc.,* 750 F.2d 1405, 1414 (7th Cir. 1984)); *Tucker v. Loyola Univ. of Chicago,* 192 F.Supp.2d 826, 834 (N.D.Ill.2002) ("Had both evaluations been truly positive—exhibiting consistent, above-average performance rather than inconsistent, mediocre performance—and had there not been such a considerable lapse of time between the last evaluation and the adverse employment action, then a material question of fact may have arisen on the issue of pretext."); *Johnson v. Penske Truck Leasing Co.,* 949 F.Supp. 1153, 1176 (D.N.J.1996) ("Unless Penske relied on Johnson's poor work performance as an articulated justification, evidence of good performance does not refute or cast doubt upon Penske's legitimate, non-discriminatory reasons for the employment decision.").

In addition, Wensel offers more than simply her positive performance evaluations. While other agents in Wensel's region are not similarly situated to her for purposes of the "rigorous test" required for comparison on her *prima facie* case, her performance relative to that of other agents is evidence that Wensel was meeting State Farm's expectations and, accordingly, serves to cast doubt on State Farm's stated reason for not awarding her an independent contract. Likewise, while the court has concluded that Hecox's statements regarding waiting to start a family and regarding the negative effects of a family on productivity are not direct evidence, they certainly are relevant to the question of pretext and support the inference that discrimination motivated State Farm's decision to extend Wensel's training period in October of 1999. The court, therefore, concludes that Wensel has generated just enough genuine issues of material fact on her proof of pretext and inference of discriminatory intent to proceed to a jury trial on her claim of disparate treat-

ment based on her failure to be awarded an independent contract.

### III. CONCLUSION

In conclusion, the court has determined that Wensel failed to create any genuine issues of material fact as to her state common-law claims. In addition, the court finds that Wensel has not come forward with direct evidence of discrimination and, therefore, that State Farm is entitled to summary judgment on its assertion that the *Price Waterhouse* framework does not apply to Wensel's discrimination claims. Moreover, under the *McDonnell Douglas* framework, which applies in the absence of direct evidence, the court finds that State Farm is entitled to summary judgment on Wensel's constructive discharge claim but not on her claim of pregnancy discrimination based on the failure to receive an independent agency contract in October of 1999.

THEREFORE, the court hereby **grants in part and denies in part State Farm's motion for summary judgment.**

**IT IS SO ORDERED.**